## THE BURLINGTON INSURANCE COMPANY v. DANIEL M. ROSS.

INSURANCE POLICY—*Proofs of Loss—Pleading and Proof—Nonsuit.* In an action on an insurance policy to recover a loss by fire, the plaintiff must aver and prove that proofs of loss were furnished within the time required by the terms of the policy, or that the condition requiring such proofs has been waived by the company; and if at the trial there is a total failure to prove either that the proofs were duly made, or that they were waived, it is the duty of the trial court to sustain a demurrer to the evidence and dismiss the action.

### *Error from Dickinson District Court.*

ACTION to recover on a policy of insurance. Judgment for plaintiff, *Ross*, at the May term, 1889. The defendant *Company* comes to this court. The facts are stated in the opinion.

*Quinton & Quinton*, for plaintiff in error.

*R. N. Smith*, and *B. C. Cranston*, for defendant in error.

Opinion by SIMPSON, C.: Action by Ross against the insurance company to recover for a loss occasioned by a fire. The fire occurred on the 18th day of July, 1887, and a dwelling-house and all the household furniture were totally destroyed. The petition alleges loss, and further avers "that he promptly notified the said defendant company of his loss, and proffered proof of loss by the fire aforesaid." This is all the allegation with reference to proof of loss, the petition containing no general averment that the terms and conditions of the policy had been performed and complied with. The third defense of the insurance company alleges "that no proof of any loss sustained by said plaintiff was ever made to this defendant, as required by the policy set forth in the petition." The plaintiff, replying to the third defense, says, "that after the fire, and before the bringing of this suit, the said defendant denied all liability for loss under said policy." At the trial the plaintiff testified as follows:

"*Ques.* Now, Mr. Ross, what did you do in regard to the

insurance on this policy? After the fire—what did you do then? Ans. I notified the company.

"Q. Notified the company? A. Yes, sir.

"Q. How did you notify the company? A. By letter.

"Q. Did you receive an answer? A. Yes, sir.

"Q. I will ask you if that is the answer you received from the company? [Letter handed witness, and marked 'Exhibit A' by the court.] A. Yes, sir; that is their reply.

"Q. After receiving this letter, what occurred with regard to the payment or adjustment of the loss? A. Well, some time afterward they sent their adjuster there.

"Q. What occurred? A. He came there and looked over the loss a little.

"Q. Who is the adjuster? A. Mr. Eggleston, from Topeka.

"Q. Do you know where Mr. Eggleston is? A. Yes, sir.

"Q. Is this the gentleman sitting there? A. Yes, sir. [Witness identifies a gentleman named Eggleston.]

"Q. Now, what did he do? A. He looked at the house a little, and asked a few questions about it.

"Q. What about? A. How it got afire.

"Q. What did you tell him? A. I told him it was from the flue, so far as I knew.

"Q. From the flue of the house? A. Yes, sir; from the flue of the house.

"Q. What else occurred? A. Then he asked me about some indebtedness upon the place.

"Q. Well, what else? A. He wanted to know how much indebtedness there was on the place at the time?

"Q. What did you tell him? A. I told him there was $1,300.

"Q. Did he offer to adjust the loss? A. No, sir.

"Q. What did he say? A. He said he wanted receipts of all moneys I had paid on the notes.

"Q. On this mortgage? A. Yes, sir.

"Q. Did you furnish them to him? A. I did, but not at that time.

"Q. When did you? A. In the course of a few days; I can't say how long, exactly.

"Q. Did you furnish him any receipts at that time? A. Yes, sir; I showed them to him; they were not all there; some of them had been destroyed by fire.

"Q. Now, I will ask you if he said anything about the

amount of insurance on the place at the time the insurance was taken? A. He did not.

"Q. Did he make any objections to paying the loss at that time? A. Did n't; did n't say whether he would pay it or not.

"Q. What next occurred? A. We asked for blanks.

"Q. Who did you ask for blanks? A. I sent and asked for them.

"Q. You may go ahead; what did you do next? A. Why, I asked for blanks.

"Q. How? A. By letter.

"Q. Did you receive any reply? A. No, sir, not about the blanks; they never mentioned it.

"Q. What was the next thing done? A. I think I asked them for blanks three or four times, in different letters; they did n't say whether they would send them or whether they would not.

"Q. Now, when was the next communication you received from the company or their agents? A. The next was, I believe, when they asked about the notes.

"Q. About the note? A. Yes, sir.

"Q. Have you that communication? A. No, sir.

"Q. Why have n't you got that? A. They wanted an answer on the back part of the letter they wrote me, and I wrote it on it and sent it in.

"Q. You returned it to them? A. Yes, sir.

"Q. Well, what was done next? A. I believe that was all that was written until the last letter came, when they said they would not pay the loss.

"Q. I will ask you, Mr. Ross, if you received this letter from the company? A. Yes, sir.

"Q. I will ask you, Mr. Ross, if you received any communication from Mr. Eggleston? A. Yes, sir. [Letter offered in evidence.]

"Q. I will ask you, Mr. Ross, if that letter was received in this envelope, and in reply to the letter you forwarded? A. Yes, sir; it was.

"Q. Where did you receive it? A. At Abilene.

"Q. Whereabouts at Abilene? A. Post office, Abilene. [Letter marked 'Exhibit B' by the court, and offered in evidence.]

"Q. I understand you to say, Mr. Ross, you received this letter through the mail? A. Yes, sir.

"Q. Mr. Ross, did you receive that letter in that envelope? A. I did — yes, sir.

"Q. Do you know why it was written?

"Q. Did you write a letter prior to that time to the company? A. Yes, sir.

"Q. Is that a letter in answer to your letter?

"Q. I will ask you, Mr. Ross, to state what this is? A. Well, we wrote to the general adjuster; he seemed to be a good while in coming. It is a card from the adjuster.

"Q. How did you receive it? A. Through the post office.

"Q. By mail? No, sir.

"Q. I will ask you what that card is? Where did you receive it? A. At Abilene; through the mail.

"Q. Is it a communication received by yourself in reply to any letter you addressed to anyone? A. Yes, sir; it is about the note.

"Q. Do you know, Mr. Ross, whether Mr. Eggleston is adjuster of the company in this state, or was at that time? A. Yes, sir; I do.

"Q. How do you know it? A. He told me so when he was out here.

"Q. Did you have any communication, the first letter introduced here, as September 17, to which this letter is a reply, and in which the president of the company says, our Mr. Eggleston? Where did Mr. Eggleston reside at that time? A. Topeka.

"Q. Did you have any communication with him before he came to your place? A. Yes, sir.

"Q. Are these the letters in reply to those you wrote? A. They are."

The plaintiff called Eggleston as a witness, who testified as follows:

"Ques. What is your occupation? Ans. I am an insurance adjuster.

"Q. Where do you reside? A. In September, 1887, I had no particular residence. My property is in Topeka; my child is in Burlington; and my wife is an invalid, at the sea-shore.

"Q. Where was your residence as an adjuster? A. In the field.

"Q. Where did your company generally address your letters? A. At different points.

"Q. Did you adjust for the state of Kansas for the Burlington Insurance Company for the year 1887? A. Yes, sir.

"Q. Was this matter referred to you? A. Yes, sir; the papers were sent to me for investigation.

"Q. Did you write those two cards? [Exhibits C and D.] A. Yes, sir."

Cross-examination:

"Q. You say you are the adjuster of the company? A. Yes, sir.

"Q. What were your duties as adjuster? A. To investigate losses.

"Q. What was your authority as adjuster of the company? A. My authority was to investigate losses.

"Q. What else? A. Why, sometimes to make out proofs, if, in my opinion, I deemed the company liable. If not, to do nothing to waive any of the conditions of the policy; to so state to the party, and refer him to the conditions of his policy; not to either admit or deny the liability, as I have no such authority.

"Q. Did you have any authority to waive the conditions in this policy? A. No, sir; I have strict orders to refer the man to his policy — the conditions in it."

Redirect examination:

"Q. Your duty was to make out proofs of loss for the policy-holder? A. Yes, sir; if in my opinion the company was liable.

"Q. Doing that all the time? A. Now all of the time.

"Q. Most of the time? A. I think most of the time; at least the greater portion of my time."

Exhibits A, B, C and D are as follows:

"EXHIBIT A.

"Loss Department, Home Office Burlington Insurance Co. Organized 1860. John G. Miller, *President and General Manager.* Jacob Alter, *Secretary.* (Claim No. 302.)

"BURLINGTON, IOWA, July 21, 1887.

"*Daniel M. Ross, Esq., Abilene, Kas.:* DEAR SIR — Your favor of the 19th, reporting loss by fire, is received. We have referred the matter to our general adjuster, at Topeka, who will give it attention as soon as he can so arrange.

Yours truly,    JOHN G. MILLER, *President.*"

"EXHIBIT B.

"Office of Burlington Insurance Co. Organized 1860. Cash capital, $200,000. John G. Miller, *President and General Manager.* Jacob Alter, *Secretary.* (Stenographic letter.) [Copy.]

"BURLINGTON, IOWA, September 17, 1887.

"*Daniel M. Ross, Esq., Abilene, Kas.:* DEAR SIR—Replying to your letters addressed to our Mr. Eggleston, would say that, after a careful consideration of the matter, we must decline to entertain any claim, because of false warranties in obtaining the insurance. It is our wish to pay all honest claims in full, but where a person misrepresents matters, as you have done, we shall rely on our legal rights under the contract. Without waiving any of our rights under the contract, we remain, Yours truly,

[Signed] JOHN G. MILLER, *President.*"

"EXHIBIT C.

"TOPEKA, KAS., August 1, 1887.

"*Daniel M. Ross, Abilene, Kas.:* DEAR SIR—I am very busy, but I hope to adjust your loss most any day within the next 10 days. Don't fret. I will get to you as soon as I can.

Yours, SETH EGGLESTON."

"EXHIBIT D.

"MARION, KAS., August 30, 1887.

"*Daniel M. Ross, Abilene, Kas.:* DEAR SIR—When you give me answers to the questions *on the back of the letter* I wrote to you, I can act understanding all the circumstances. Until you do, without waiving any of my company's rights under this policy, I remain, Yours truly,

SETH EGGLESTON, Topeka, Kas."

By any fair construction of the pleadings, it is not alleged that proofs of loss were made or waived within the time required by the policy that they should be furnished. The allegation in the reply, that "after the fire and before the commencement of this action the defendant denied all liability for loss under said policy," is not definite enough. To be effectual, they must have alleged denial of liability before the time in which proofs of loss are to be furnished by the terms of the policy had expired. At the trial the defendant in error failed

to prove, either that he made proofs of loss within the time so required, or that the same was waived by denial of liability or otherwise. The evidence established that the first denial of liability was made by letter from the president of the company, of date September 17, 1887, and the fire occurred on the 18th of July of the same year. The denial was made after the 60 days had expired within which proofs could be made. The plaintiff in error, the insurance company, demurred to the evidence because no cause of action was proved, and this demurrer was overruled and judgment rendered for the amount of the loss. The overruling of the demurrer was error, for which the cause must be reversed. There was no evidence offered at the trial that proved, or tended to prove, that proofs of loss had been made, or that they had been waived. There was a total failure of proof on a necessary and vital fact, material to the recovery. If there was any evidence in this record which, by the most liberal construction, could be held to be a waiver by the company of that condition of the policy that required proofs of loss to be made within a specified time, we have failed to find it. It may be that the company played with the assured, yet he ought to have performed this condition while it was in his power to do so. Yet we cannot say from the record presented that he was misled by anything the company by its agents said or did; because, if we could, we would hold that the company had waived the condition as to proofs of loss.

It is idle to cite authorities to the proposition that in actions of this character it is necessary to a recovery that the terms and conditions of the policy with regard to proofs of loss must be shown to have been substantially complied with, or that such condition had been waived in some manner recognized by the law as sufficient for that purpose. Without commenting on the pleadings, we say again that at the trial there was a total failure of proof on a fact material for the recovery, and because of this the demurrer to the evidence ought to have been sustained, and the action dismissed.

We recommend that the judgment be reversed, and the cause remanded, with instructions to proceed in accordance with this opinion.

By the Court: It is so ordered.

All the Justices concurring.